IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

JANET LEWIS, Individual,

    Plaintiff

CASE NO.: 1:16-cv-21473

v.

BED BATH & BEYOND, INC.
    Defendants.

COMPLAINT
DEMAND FOR JURY TRIAL

_____/

## COMPLAINT

Plaintiff, JANET LEWIS, an Individual, files this Complaint against Defendant, BED BATH & BEYOND, INC., a Corporation, and hereby alleges the following:

## PARTIES VENUE AND JURISDICTION

1. Plaintiff, JANET LEWIS, (hereafter "JANET" or " Plaintiff"), was at all times relevant to this action, an employee or former employee of Defendant, BED BATH & BEYOND, INC., doing business as BED BATH & BEYOND, and at all times relevant to this action, Plaintiff resided in the county of Miami-Dade, State of Florida.

2. Defendant BED BATH & BEYOND, INC., (hereinafter "BB&B" or "Defendant"), A Corporation, at all times relevant to this complaint was, doing business within the County of Miami-Dade, State of Florida. At all relevant times, is located at 19205 Biscayne Blvd., Store #197, Aventura, FL., 33180 and 650 Liberty Ave., Union NJ., 07083. BB&B is in the business of owning and operating a national chain of domestic merchandise of retail stores in both the United States and Canada. BB&B operates over 75 locations in Florida and 973 throughout the United States. BB&B at all times relevant is an employer earning approximately 11.5 Billion in Annual Net Sales.

1

3. Venue and jurisdiction are proper in this court. Venue is proper pursuant to 28 U.S.C. §1441(a) and based upon diversity jurisdiction under 28 U.S. C. section 1332(a)(1), 1367 and the amount in controversy exceeds the $75,000 minimum of this court.

4. This court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) because this lawsuit is a civil action for civil claims arising under the laws of the United States.

5. The alleged unlawful acts of Defendant giving rise to this action were committed in Miami-Dade County, Florida.

## STATEMENT OF FACTS

6. JANET was hired by BB&B on or about October 26th, 2014 as a yearly Fine Table and China Associate which appears on her weekly schedule as BBB FTG Associate.

7. Initially, JANET, received the schedule she requested consisting of 6 hours a day, 3 days a week for a total of 18 hours a week, only during the day since she could not work nights due to her disability and no Wednesdays due to personal commitments she made to attend Chemo treatments with her close friend.

8. JANET has suffered for years from severe anxiety from a rape that happened in 2010, she quietly pulled a female manager aside when she was hired and explained to her that she had a mental disability for post-traumatic stress disorder.

9. The BB&B female manager instructed her to write her disability down in order for all managers to be aware of it for scheduling purposes, since JANET could not work past 8pm and was terrified to travel late at night.

10. As instructed pursuant to BB&B management, JANET, submitted her disability and limitations to her scheduling manager.

11. In less than a week on November 1st, 2014, upon JANET's arrival to work at 4PM sharply, BB&B Department Manager (also known as Manager of the Day or "MOD"), NASSER MASIS, (hereinafter referred to as "NASSER") directed JANET to go immediately with him to train her in replenishment. This was not a job duty and he required her to follow him to a dimly lit storage room where there were no security cameras where he proceeded to sexually assaulted her.

12. NASSER first climbed up a ladder and asked JANET to stand below him so he could stare down into her shirt at her breasts. When JANET noticed his eyes focused on her breasts she felt immediately trapped and had an anxiety attack that physically manifested itself as she tried to hide her anxiety not to lose her job.

13. NASSER directed her where to stand then he leaned back into her and rubbed his back arm up and down in between her breasts, as if he was moving his penis between her breasts, or what is otherwise generally referred to in sexual context as titty f***ing her with his arm. She immediately felt horrified, shamed and humiliated.

14. At the same time, NASSER was sexually assaulting her with his arm rubbing up and down between her breast, he was telling her how he had access to as much money as he needed to buy whatever he wanted, implying he would pay her for sex or buy her anything she would want in return for allowing him to have sex with her. JANET froze in shock and stood in fearful silence at his harassing and assaulting sexual behavior.

15. BB&B did not provide any training manuals to clearly delineate what duties were required of each department Associate or their respective Managers.

16. Managers of the Day, also known as "MOD", are given complete and unfettered discretion to pick and choose any work tasks performed by Associates.

17. BB&B have no protocols and/or procedures in place to determine who is the MOD and therefore one associate could have multiple MODs directing them, which happened to JANET daily.

18. JANET, after several incidents of sexual harassment, disability discrimination and racial discrimination, complained along with customers that witnessed some of the abusive practices used against her to the BB&B, Store Manager on duty MATT CROSS, hereinafter referred to as "CROSS".

19. In retaliation for the previous complaints, BB&B managers began ignoring her disability and began scheduling JANET for midnight shifts.

20. BB&B, Department Manager, TIM, further disrespected her disability by requiring JANET to stay late to complete tasks such as replenishing, domestic cleaning, display arrangements, labor intensive tasks that were not ordinary for her position or required of other similarly situated employees of another race or color.

21. Additionally, there were other employees capable of performing the tasks and who were not required to perform any domestic or labor intensive tasks including TIM himself.

22. BB&B never required any specific Managers be assigned to particular areas or departments, TIM would act as JANET'S manager, despite not being assigned to direct JANET and not training her, he on a daily basis would yell at her in front of customers and other co-workers in a demeaning and angry manner.

23. TIM would daily treat JANET as if she had a disability that made her incompetent to be literate or to interact with customers.

24. TIM would deny JANET training stating it was too burdensome to have to teach her, implying her mental status was less than that of a child and other associates were more competent than her

25. TIM denied JANET complete computer, Purple Paper and Bridal training that everyone else in the department received.

26. TIM would imply JANET was mentally disabled and not smart enough to work on the computers and required her to perform labor intensive work that she was not a requirement of her position.

27. TIM would yell obscenities, such as "I hate to f***ing close" to JANET, blaming her for not being able to stay late and close the store due to her disability.

28. When JANET would try to help customers at the customer's request, XAVIER and NASSER would run over and tell the customer JANET didn't know how to do anything, implying she was too stupid to help the customer and they would take over helping the customer.

29. On November 7th, 2014, XAVIER after demeaning JANET on several occasions and stating she was not capable of helping customers, violating JANET'S personal space and approaching her from behind, leaning his head near her neck and ear and stated "your hair looks pretty" as he walked by JANET. Startled and annoyingly repulsed by him, she could smell his cologne and feel his breath on her neck which gave her a disgusting feeling in the pit of her stomach. This behavior was witnessed and ignored by other MODs.

30. When JANET refused the advances of XAVIER and he saw the repulsed look on her face, he as manager on duty immediately called a "morning huddle" requiring all employees to get close while he intentionally humiliated JANET by yelling questions at her, such as "What do we say to a customer when they walk into our store?" JANET then replied being a good cooperative

employee, " What Item may I help you find?" He yelled at her "No Janet YOU ARE WRONG, it is "What Item can I help you look for?", all of her co-workers laughed at her. She immediately felt intimidation, fear and belittled and left the meeting in shame with her head down and retreated to section of the store she was hired as an FTG Associate to work.

31. XAVIER then stared hard at her and smirked making her feel so much fear and repugnancy of him she physically moved behind a display to avoid his demeaning and hateful glare. The morning huddles and the discriminatory and abusive behavior would continue against JANET on a repetitive and daily basis.

32. XAVIER began daily to stalk JANET within the store and would yell at her and correct her unnecessarily anytime she tried to help a customer by yelling at her "NO", "We say What item can I help you look for today". To the point where JANET found herself trying to hide behind displays to avoid the daily humiliation and embarrassment he caused her.

33. As she began to vacuum, XAVIER ran up to her screaming at her to leave her section and go perform duties in another area of the store. JANET helped in the other section and the employee, EDDIE participating in the ongoing sexual harassment that had become a part of the Bed Bath & Beyond culture intentionally further demeaned Ms. Lewis by telling her in a mocking manner "Thank you, HONEY," being fully aware in the staff huddles this was a way to further humiliate JANET.

34. "HONEY" was a derogatory, racist code for her light skin and hair made in a sexual context that she was sweet honey for the male dark skin Managers in the store.

35. Due to being harassed and humiliated the entire day, JANET began to physically shake and suffered from tremors as she returned back to her section not knowing what to expect next.

36. As JANET attempts to pull up a bridal registry for a young couple, XAVIER begins yelling at her again from across the section and in front of customers and staff. He forced her with tears in her eyes to go to work on the cash registers. Once again embarrassed and humiliated she went to the cashier area.

37. Where another co-worker joined in the harassing behavior and mockingly told JANET to get on the "END" cash register as it was "SLOWER" for her. Then later that same afternoon he walked closely by her telling her "you look "SEXY" today," while laughing and looking at her body from head to toe. Reinforcing to JANET she was a dumb white girl only useful as a sexual object.

38. Again when JANET went to take a bathroom break, EDDIE, the co-worker asked her for a mint she laid them on the counter for him and continued to the bathroom. When she returned EDDIE was holding the mints in his hands jostling them in front of her. When she reached for them he jerked the mints away while laughing at her until she gave up and walked away in protest.

39. TIM further insulted, belittled and treated her like she suffered from a disability she did not have by accusing her of not being able to read as if she was illiterate in front of customers.

40. When a customer complained she was overcharged for dishes that had been marked down according to a sign in the store, TIM blamed JANET for not reading the sign properly and repetitively yelled at her more than six times, "This is the SIGN and THESE ARE THE DISHES," then shouted for her to come stand next to him so he could yell at her in her face again, THIS IS THE SIGN, THESE ARE THE DISHES!!!

41. The customer, Patricia Smith was so incensed by having to watch JANET's humiliation she complained to CROSS the store manager.

42. JANET became a victim of gang stalking by her superiors, every manager was in charge of her and when she complained to the Head Store Manager, CROSS, he blamed, JANET, the victim and accused her of being too dumb to read a sign that caused all the problems with the other managers.

43. CROSS failed to conduct any further investigation into the matter as would have occurred if he had been formerly and properly trained to handle human resource matters.

44. JANET was so exhausted emotionally and physically from the public humiliation and belittling she received she let CROSS know she had to leave early as she could not handle or tolerate anymore, sexual or discriminatory conduct as to her mental state.

45. XAVIER as previously mentioned would send JANET from section to section to be sexually and racially discriminated against with the fellow managers commenting on her hair and calling her "HONEY" bringing attention to her light complexion and fine hair texture and openly soliciting their sexual desires for her.

46. XAVIER would send JANET to complete a task such as picking up boxes, then before it was humanly possible to complete the task he would complain to CROSS that she was incapable of completing the task and berate her for not completing the task.

47. Consistently and Repeatedly the managers would deny training to JANET on any of the computers telling her in front of co-workers and customers she was too incompetent to receive training on the computers.

48. NASSER and XAVIER would often times team up on JANET, on November 28th, 2014, they called her into a private office and closed the door after JANET had already been sexually assaulted by NASSER in the stockroom to berate and belittle her again and again causing her to be terrified of both of them.

49. JANET let them know immediately upon XAVIER closing the door with the three of them in the room she felt intimidated, scared and frightened to be alone in a room with them and a closed door.

50. JANET was in fear of losing her job if she did not stay in the room and listen to their ranting belittling, insulting and condemning attacks on her person. The berating would be so severe that she would go into shock was unable to speak and would stutter if she did try to speak, only making the taunting and harassment worse.

51. On November 29th, 2014, JANET suffered severe migraines from the abusive treatment she was receiving at work and had to call in sick.

52. In retaliation, for JANET's known rejection of the sexual advances and her sensitivities due to her mental disability, the team of gang stalkers otherwise acceptably referred to by all employees of Bed Bath & Beyond as MOD – or Managers of the Day, closely resembling MOB or mobsters, began to try to get her to close the store, reduced her hours, scheduled her for days they knew she requested off, and limited her to one day a week.

53. They then demoted her from a part-time Fine Table and China to a general seasonal associate. One co-worker, named Jennifer, then teased Janet that she was changed to (s) for being "specialized" in so many areas, making fun of the gang stalking and JANET being sent by one manager to the next for sexual harassment by all managers.

54. It became a daily game for the MOD to see who could get JANET to respond to their sexual advances and innuendos.

55. JANET became the target of harassment by all co-workers and managers and it became a part of everyone's acceptable daily mission to harass her.

56. On December 27th, 2014, TIM stated the reason for JANET'S demotion was a general consensus from NASSER, XAVIER and everyone, we just don't think, that your, not that… your customer service is great, we don't think your making it as far as this side it seems like a struggle, nothing against you."

57. On December 29th, 2014, as the demotions and gang style harassment continued JANET was constructively discharged and compelled to resign, as she could no longer tolerate the sexual harassment, racial code language and limitations placed upon her by her co-workers and MODs.

58. BB&B has no procedures in place to determine the competency of an individual leaving complete arbitrary and unfettered discretion to its managers.

59. The managers in this case violated JANET'S rights in making a GANG style decision to stalk, harass, intimidate and demote her in retaliation to her rejection of their behavior.

## FIRST CAUSE OF ACTION

**(Disability Discrimination in Violation of ADA 1990 title I and V (4) – Examination and inquiry – Title I Sec. 102 (4) 42 USC 12112 (1)(4))**

60. The allegations of paragraphs 1 through 59, inclusive, are realleged and incorporated by reference.

61. Plaintiff is a female with a mental disability due to Post Traumatic Stress Disorder.

62. Plaintiff's disability was required to be kept apart from general personnel files and available only under limited conditions. However, defendant, BB&B Manager instructed JANET in violation of the ADA to write her disability down for all managers to examine and inquire.

63. Defendant, BB&B's conduct violated 42 U.S.C. 12112 (1)(4) by: 1) demoting Plaintiff, 2) refusing to investigate discriminatory conduct, 3) disparate application of company practices,

procedures and policies, 4) retaliating against plaintiff for making protected complaints and 5) otherwise discriminating against Plaintiff with regard to the terms and conditions of her employment.

64. As a proximate result of the aforementioned violations, Plaintiff has been damaged in an amount in excess of the jurisdiction of this Court. Plaintiff also seeks "affirmative relief" or "prospective relief".

## SECOND CAUSE OF ACTION

### (Prohibition Against Retaliation and Coercion 42 U.S.C. 12203 (a-b))

65. The allegations of paragraphs 1 through 64, inclusive, are realleged and incorporated by reference.

66. At all times relevant in this complaint, 42 U.S.C. 12203 (a-b) were in full force and effect, and were binding upon all Defendants and each of them. Plaintiff has complied with the requirements of the ADA that she filed a complaint with the EEOC and obtained a right-to-sue letter issued by the EEOC.

67. Defendants' BB&B managers, XAVIER, TIM AND NASSER in retaliation for complaints by Plaintiff and rejection of their harassing and discriminatory conduct retaliated by escalating the conduct, demoting Plaintiff and removing her from the schedule to once a week.

68. As a direct and proximate result of defendants' retaliatory conduct, plaintiff has lost income and benefits including medical and other employment benefits, retirement benefits, and other related benefits.

69. As further direct and proximate result of Defendants' demotion from year round Associate to seasonal associate, reduction of hours, prohibition from training and substantial other limitations, plaintiff has suffered emotional injury and mental distress.

70. Plaintiff JANET has been required to obtain legal counsel to protect her rights, and she thereby has incurred attorney fees in an amount to be proven at the time of trial. Plaintiff requests an award of reasonable attorney's fees against defendant.

71. Pursuant to 42 USC §12203 (a-b), plaintiff JANET seeks recovery against defendant BB&B.

72. The conduct of defendants, including their agents and employees, was done with conscious disregard of plaintiff's rights, was carried out by authorized agents and employees, was done with conscious disregard of plaintiff's rights, was carried out by authorized agents acting in a deliberate, calloused, and intentional manner in order to injure and damage plaintiff, which conduct was despicable, egregious and oppressive, and constituted fraud, malice or oppression. Therefore, plaintiff is entitled to punitive damages in an amount sufficient to punish or set an example of defendant, in a sum to be proven at trial.

## THIRD CAUSE OF ACTION

### ( 29 CFR 1630 – 1630.2(k)(l), 1630.5 Regarded as Substantially Limited)

73. The allegations of paragraphs 1 through 71, inclusive, are realleged and incorporated by reference.

74. At all times relevant in this complaint, 29 CFR 1630 – 1630.2 (k)(l), 1630.5 were in full force and effect, and were binding upon Defendant.

75. Plaintiff is a female with a mental impairment that is not substantially limiting and suffered unfair discrimination because her co-workers and managers perceived her to have such a limitation.

76. JANET was segregated and limited in her job duties due to this perceived limitation and it adversely affected her employment opportunities within the company based upon BB&B stereotypes, fears, or misconceptions about disability.

77. Managerial employment decisions were based upon unsubstantiated concerns about productivity, acceptance by co-workers and the inconvenience of having to make special accommodations. For Example, TIM yelling at JANET to stay late, scheduling her past 8PM and shouting in front of her he hates having to "f***ing close" all the time.

78. JANET was not allowed to train on the computers and was relegated to manual tasks and slow cash registers due to the false perceptions of her co-workers and managers that she suffered from a perceived mental limitation.

79. As further direct and proximate result of Defendants' demotion of plaintiff from year round Associate to seasonal associate, removal from Fine Table and China to the slow Cashier, reduction of hours, requirement to work past 8PM despite her diminished employment, prohibition from training and substantial other limitations, plaintiff has suffered emotional injury and mental distress that physically manifested in the form of migraines, stuttering, physical shaking, crying and severe anxiety attacks.

80. Plaintiff JANET has been required to obtain legal counsel to protect her rights, and she thereby has incurred attorney fees in an amount to be proven at the time of trial. Plaintiff requests an award of reasonable attorney's fees against defendant.

81. Pursuant to 29 CFR 1630 – 1630.2 (k)(l), 1630.5, plaintiff JANET seeks recovery against defendant BB&B.

82. The conduct of defendants, including their agents and employees, was done with conscious disregard of plaintiff's rights, was carried out by authorized agents and employees,

was done with conscious disregard of plaintiff's rights, was carried out by authorized agents acting in a deliberate, calloused, and intentional manner in order to injure and damage plaintiff, which conduct was despicable, egregious and oppressive, and constituted fraud, malice or oppression. Therefore, plaintiff is entitled to punitive damages in an amount sufficient to punish or set an example of defendant, in a sum to be proven at trial.

### FOURTH CAUSE OF ACTION

**(Sexual Harassment in Violation of Title VII §703, 29 CFR §1604.11)**

83. The allegations of paragraphs 1 through 82, inclusive, are realleged and incorporated by reference.

84. At all times relevant in this complaint, Title VII §703, 29 CFR §1604.11, were in full force and effect, and were binding upon Defendant

85. BB&B allowed for a "hostile work environment" to exist in violation of Title VII requiring JANET "to run a gauntlet of sexual abuse in return for the privilege of being allowed to work[1]."

86. BB&B have not taken any steps necessary to prevent sexual harassment from occurring such as affirmatively raising the subject, expressing strong disapproval, developing appropriate sanctions, informing employees of their right to raise and how to raise the issue of harassment under title VII, and developing security methods and practices to sensitize all concerned.

87. Plaintiff, was followed by XAVIER, TIM AND NASSER while being yelled at demeaned that she was incapable of reading signs or working on the store computers for lack of intelligence. She was consistently and routinely victimized by being sexually assaulted, barraged with sexual innuendos and code language, sent from one manager to the next for sexual gawking,

---

[1] *Henson v. City of Dundee,* 682 F.2d 897, 902, (11th Cir.1982).

inappropriate touching, jostling and comments for the amusement of the managers and co-workers.

88. BB&B has a historically low number of female executives compared to similarly situated corporations and lacks an ability for female employees to advance to managerial and/or executive positions.

89. There is a lack of sufficient internal policies and procedures for reporting sexual harassment.

90. There is only one regional HR Representative for the Florida store and Plaintiff was required to report inappropriate sexual harassment to an insensitive manager, TIM or CROSS that was not trained in Human Resources about intimate personnel issues.

91. As a proximate result of the aforementioned violations, Plaintiff has been damaged in an amount in excess of the jurisdiction of this Court. Plaintiff also seeks "affirmative relief" or "prospective relief".

92. Pursuant to Title VII §703, 29 CFR §1604.11, plaintiff JANET seeks recovery against defendant BB&B.

93. The conduct of defendants, including their agents and employees, was done with conscious disregard of plaintiff's rights, was carried out by authorized agents and employees, was done with conscious disregard of plaintiff's rights, was carried out by authorized agents acting in a deliberate, calloused, and intentional manner in order to injure and damage plaintiff, which conduct was despicable, egregious and oppressive, and constituted fraud, malice or oppression. Therefore, plaintiff is entitled to punitive damages in an amount sufficient to punish or set an example of defendant, in a sum to be proven at trial.

## FIFTH CAUSE OF ACTION

### (Vicarious Liability of BB&B for its Supervisors/Managers)

94. The allegations of paragraphs 1 through 93, inclusive, are realleged and incorporated by reference.

95. The rules in *Ellerth* and *Faragher*[2] hold Defendant, BB&B vicarious liable for harassment by supervisors/managers based on sex, race, national origin and/or disability.

96. The standard of liability is premised on two principles, 1) an employer is responsible for the acts of its supervisors and 2) employers should be encouraged to prevent harassment. *Id.*

97. XAVIER, NASSER and TIM all had supervisory control over Plaintiff, JANET. They all respectively had authority to recommend tangible employment actions and took such actions to move her from various departments, undesirable reassignment, work assignment, refusal to promote or train her, demoted her to cashier and one work day a week on the schedule. Additionally, all 3 had authority to direct her daily work activities and all engaged in harassing, demeaning and abusive conduct toward her.

98. As a proximate result of the aforementioned violations, Plaintiff has been damaged in an amount in excess of the jurisdiction of this Court. Plaintiff also seeks "affirmative relief" or "prospective relief".

99. The conduct of defendants, including their agents and employees, was done with conscious disregard of plaintiff's rights, was carried out by authorized agents and employees, was done with conscious disregard of plaintiff's rights, was carried out by authorized agents acting in a deliberate, calloused, and intentional manner in order to injure and damage plaintiff, which conduct was despicable, egregious and oppressive, and constituted fraud, malice or

---

[2] *Burlington Industries, Inc. v. Ellerth,* 118 S.Ct. 2257 (1998) and *Faragher v. City of Boca Raton,* 118 S.Ct. 2275 (1998).

oppression. Therefore, plaintiff is entitled to punitive damages in an amount sufficient to punish or set an example of defendant, in a sum to be proven at trial.

### SIXTH CAUSE OF ACTION
### (National Origin/Race Discrimination in
### Violation of Title VII §703 (a)(1-2) and 42 U.S.C. §1981)

100. The allegations of paragraphs 1 through 99, inclusive, are realleged and incorporated by reference.

101. At all times relevant in this complaint, Title VII §703 (a)(1-2) and 42 U.S.C. §1981 were in full force and effect, and were binding upon all Defendants and each of them.

102. Plaintiff is American Indian and Irish and was disparately treated in such a way as to deliberately disfavor her due to her color and race.

103. Other employees of darker color and different races were not yelled at, reprimanded, demeaned, required to perform manual tasks, they were allowed to approach customers, to access the registry/computers, to leave on time, to take breaks and they were not continually followed and watched by their managers. Therefore, meeting the McDonnel-Douglas test[3].

104. Plaintiff had favorable job performance and customers that were happy to work with her. JANET was the target of racially discriminatory comments about her hair being pretty because it was fine, light and thin and being called "honey" since she was light skinned.

105. EDDIE a co-worker made a racially-biased statement when he said JANET had to work on the slow cash register inferring she was not capable of handling a regular cash register like the other darker skinned employees, but that she was pretty. Implying she is pretty but dumb because she is fair skinned or code for "dumb blonde."

---

[3] *McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).*

106. The disparate treatment of JANET compared to employees of a different color could not be justified by any business necessity.

107. JANET was discriminated in the terms, conditions and privileges of employment because of her race and national origin.

108. Employees that shared the same race as the managers received race based-favoritism, and were allowed to leave early, not finish projects, take breaks, and train on the computers further violating Title VII.

109. While JANET, was relegated to cleaning their unfinished projects and climbing ladders to stock shelves and set up displays, so she could be gawked at in a sexual manner by her MODs.

110. As further direct and proximate result of Defendants' discriminatory act, plaintiff has suffered emotional injury and mental distress.

111. Plaintiff JANET has been required to obtain legal counsel to protect her rights, and she thereby has incurred attorney fees in an amount to be proven at the time of trial. Plaintiff requests an award of reasonable attorney's fees against defendant.

112. Pursuant to Title VII §703 (a)(1-2) and 42 U.S.C. §1981, plaintiff JANET seeks recovery against defendant BB&B.

113. BB&B uses subjective selection criteria that leave individual managers with unfettered discretion in making employment decisions.

114. The conduct of defendants, including their agents and employees, was done with conscious disregard of plaintiff's rights, was carried out by authorized agents and employees, was done with conscious disregard of plaintiff's rights, was carried out by authorized agents acting in a deliberate, calloused, and intentional manner in order to injure and damage plaintiff,

which conduct was despicable, egregious and oppressive, and constituted fraud, malice or oppression. Therefore, plaintiff is entitled to punitive damages in an amount sufficient to punish or set an example of defendant, in a sum to be proven at trial.

### DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury by all issues so triable.

### PRAYER FOR DAMAGES

WHEREFORE, Plaintiff, JANET LEWIS, prays for judgment in her favor and against the defendant, BED BATH & BEYOND, INC. in the sum of 1.1 BILLION AND NO/100 ($1,100,000,000) DOLLARS, PLUS COSTS AND INTEREST, AND ANY OTHER COSTS THIS Court deems fair and in accordance with public policy, historical data of discrimination and mistreatment of employees by the Defendant. Inclusive of, but not limited to the following damages are lost wages, lost employee benefits, bonuses, vacation benefits, mental and emotional distress, and other general and special damages according to proof, incidental, consequential and punitive damages, any prejudgment interest at the legal rate and for attorney fees as provided for under any statutory provisions and for costs of suit.

DATED: APRIL 25TH, 2016

TROUTWINE LAW GROUP, LLC

Respectfully Submitted,

by /s/ Tonia Troutwine
TONIA TROUTWINE, Esq.
Fla.Bar. No. 692387
Attorney for Plaintiff JANET LEWIS
1602 Alton Road, #438
Miami Beach, FL 33139
E-mail: tonia.atty@gmail.com
Tel:786-201-0022